# United States District Court
# Central District of California

| | |
|---|---|
| ESTATE OF PEDRO MONTANEZ et al,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CITY OF INDIO et al,<br><br>                    Defendants. | Case No. 5:17-cv-00130-ODW(SHK)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [46]** |

## I.    INTRODUCTION

This case arises from the shooting death of Pedro Montanez, Sr. ("Montanez" or "the Decedent") in the City of Indio, California.  (Compl., ECF No. 1.)  The Decedent's wife, Maria Telles, surviving children—Pedro Montanez, Ramona Montanez, and Christina Montanez (collectively, "Plaintiffs")—bring claims individually and on behalf of Montanez's estate.  Plaintiffs bring the instant civil rights action against the City of Indio ("Indio"), the Indio Police Department, Officer Chris Cordova ("Cordova"), Officer Kevin Fowler ("Fowler"), and unknown employees of the Indio Police Department (collectively, "Defendants").  (*Id.*)  The Complaint alleges six causes of action: (1) excessive force under 42 U.S.C. § 1983;

(2) Municipal Liability for Unconstitutional Customs and Practices under 42 U.S.C. § 1983; (3) Interference with Familial Integrity under 42 U.S.C. § 1983; (4) Assault and Battery; (5) Wrongful Death; and (6) civil rights violations under California Civil Code § 52.1.  (*Id.*)  Before the Court is Defendants' Motion for Summary Judgment. (Mot., ECF No. 46-1.)   Having carefully considered the record in this case, the parties' briefing, and the relevant law, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion.[1]

## II.    BACKGROUND

### A.    Factual Background

#### 1.  The 911 Call

On August 20, 2016 at 9:15 p.m., Indio Police Department received a 911 call from a woman who reported a man yelling and threatening her with a knife on Jackson Street.   (Defendants' Statement of Uncontroverted Facts ("SUF") ¶¶ 1–2, ECF No. 46-2; Plaintiffs' Statement of Genuine Issues of Material Fact ("SGI") ¶¶ 1–2, ECF No. 50.)  The caller identified the man as someone who lived in her apartment building, and described him as Hispanic, wearing jeans, a grey shirt, thin, not tall, and "medium sized."  (SUF ¶¶ 3–4; SGI ¶¶ 3–4.)  She said that the man was going in and out of an apartment, and later stated that he was holding scissors.  (SUF ¶ 4; SGI ¶ 4.)

#### 2.  Officer Fowler and Deployment of Taser

Officer Fowler was the first officer to respond to the 911 call, and arrived at the parking lot of the Rancho Fresco Market, also located on Jackson Street.  (SUF ¶ 6; SGI ¶ 6; Fowler Decl. ¶ 4, ECF No. 46-4.)  After exiting his police cruiser, Fowler activated his body worn camera ("BWC") and proceeded to look for the suspect.[2]

---

[1] After carefully considering the papers filed in support of and opposition to the Motion, the Court deems the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; L.R. 7-15.

[2] The Officers' body camera videos, presented on summary judgment, have been carefully reviewed by the Court and relies upon it for the purpose of this Motion.  (*See* Fowler Decl., Ex. A.— Fowler BWC Footage; Cordova Decl., Ex. A., Cordova BWC Footage, ECF No. 46-4.)

(Fowler Decl. ¶¶ 5, 6; Fowler Decl., Ex. A—Body Worn Camera Footage ("Fowler BWC Footage"), ECF No. 46-4.)  Fowler shined his flashlight at an individual near the apartment building with something metallic in his hand.  He immediately recognized him as decedent, Pedro Montanez.  (Fowler Decl. ¶ 7.)  Just the day before, Officer Fowler arrested Montanez for battery; the week prior, he observed Montanez being uncooperative, aggressive and yelling at JFK Hospital, after other officers had arrested Montanez.  (SUF ¶¶ 13–15; SGI ¶¶ 13–15; Fowler Decl. ¶ 10.)  While at the hospital, Fowler recalls the officers looking for a spit mask to use on Montanez.  (SUF ¶ 16; SGI ¶ 16.)

Once Officer Fowler noticed Montanez, he walked toward him and asked, "What's going on?  What are you doing?"  (SUF ¶ 18; SGI ¶ 18.)  Montanez walked toward Fowler holding an object in his hand.  (SUF ¶ 19; SGI ¶ 19.)  Fowler radioed to dispatch that Montanez was "coming at him with scissors" and that he had him "at taser point."  (SUF ¶¶ 24–25; SGI ¶¶ 24–25.)  Montanez continued to approach Fowler and was saying something that Fowler could not understand.  (Fowler Depo., 130:19–131:1; ECF No. 49-1, Ex. 1.)  Officer Fowler told Montanez to "stop" and "drop it," but Montanez continued to move forward.  (Fowler Decl. ¶ 16.)  At that point, Officer Fowler deployed his taser at Montanez.  (*Id*.)  Montanez hunches forward slightly, but remains standing.  (Fowler BWC Footage.)  Officer Fowler takes out his rapid containment baton ("RCB") and extends it.  (*Id*.)  Fowler continuously orders Montanez to get on the ground.  (*Id*.)  Montanez does not comply and continues to yell at Fowler in Spanish.  (*Id*.)  At one point, Fowler tells Montanez to "stop" and Montanez replies "You stop too" in English, and then goes back to yelling in Spanish and pointing at Fowler.  (*Id*.)  A few seconds later, sirens from Officer Cordova's police car can be heard.  (*Id*.)

### 3.  Arrival of Officer Cordova and the Use of Deadly Force

After hearing Officer Fowler's call to police dispatch, Officer Cordova drove to assist Fowler, and pulled his police car into the parking lot where Fowler and

Montanez were located. (SUF ¶ 54; SGI ¶ 54.) Officer Cordova knew that the suspect involved was Montanez, "the same subject he dealt with before." (SGI ¶ 12; Cordova Depo., 172:03–172:13, ECF No 49-2.) After stopping his vehicle, Officer Cordova exited, took out his RCB and expanded it. (Cordova Depo., 204:13–17; Fowler BWC Footage.) Montanez backed up from Officer Fowler and began to move towards Officer Cordova. (SGI ¶ 57; Fowler BWC Footage.) Montanez faced Cordova in a "bladed" stance, with his left foot in front, his body turned sideways, and his right leg behind him. (Fowler BWC Footage.) Montanez was holding the scissors in his right hand. (*Id.*) Directly after Montanez turns to face Cordova, Cordova drops his RCB, pulls out his gun, and points it at Montanez. (*Id.*) Officer Cordova begins to yell at Montanez, and Officer Fowler is heard continuously ordering Montanez to "get on the ground." (*Id.*) Officer Cordova yells "Don't come towards me with that, I'm giving you a warning." (*Id.*) Montanez continues yelling in Spanish while pointing his left finger at Cordova. (*Id.*) At this point, Cordova and Montanez are approximately four feet apart, and Cordova's back is to the sidewalk adjacent to the street. (*Id.*) Cordova then yells, "You are going to get shot." (*Id.*) Three seconds later, Cordova fires seven shots from his gun, striking Montanez. (*Id.*) Montanez falls to the ground. (*Id.*) Officer Cordova radios to dispatch "Shots fired, shots fired. One down. Requesting a supervisor. He was coming at me with scissors." (SGI ¶ 74; Fowler BWC Footage.)

**B. Procedural History**

Plaintiffs commenced this action on January 25, 2017. (Compl.) Defendants moved for summary judgment on all causes of action on February 20, 2018. (ECF No. 46.) Plaintiffs opposed the Motion on March 12, 2018. (Opp'n, ECF No. 48.) On March 19, 2018, Defendants filed a Reply. (Reply, ECF No. 55.)

///

///

///

# III. LEGAL STANDARD

## A. Summary Judgment

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative," the Court may grant summary judgment. *Id.* at 249–50 (citation omitted). At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559–60 (2006).

The moving party has the burden of demonstrating the absence of genuine issue of fact for trial. *Celotex*, 477 U.S. at 323. To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). Once the moving party satisfies its initial burden of production, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact. *Id.* at 1103.

"It is well-settled in this circuit and others that the filing of cross-motions for summary judgment, both parties asserting that there are no uncontested issues of material fact, does not vitiate the court's responsibility to determine whether disputed issues of material fact are present. A summary judgment cannot be granted if a genuine issue as to any material fact exists." *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir.1978).

# IV. EVIDENTIARY OBJECTIONS

## A. Plaintiffs' Objections

The Court **SUSTAINS** Plaintiffs' foundation/speculation objections to Defendants' SUF ¶¶ 45, 50, 52, 58; and **SUSTAINS** Plaintiffs' objection to ¶ 60 as misstating the evidence. (SGI ¶¶ 45, 50, 52, 58.)

The Court **OVERRULES** Plaintiffs' speculation objection to Defendants' SUF ¶ 53; and **OVERRULES** Plaintiffs' objection to ¶ 64 based on speculation and misstating the evidence. (*Id*. ¶¶ 53, 64.) The Court also **OVERRULES** Plaintiffs' lack of foundation/speculation objections to portions of the declaration of Defendants' expert, Ron Martinelli, Ph.D., insofar as this testimony is based on Martinelli's personal knowledge regarding the training and instruction of police officers in California. (*Id*. at ¶¶ 80–92; Declaration of Ron Martinelli, Ph.D., ECF No. 46-5.)

## B. Defendants' Objections

Defendants object to Plaintiffs' use of an expert report created by Roger Clark (Plaintiff's Expert Report ("Clark Report"), ECF No. 49-8), upon which Plaintiffs rely to support their contentions of fact and their Opposition. (*See* Objection to Plaintiffs' Expert Report ("Objection"), ECF No. 55-7.) The Court **SUSTAINS** Defendants' objections to the following paragraphs of Plaintiffs' Statement of Genuine Issues of Material Fact, on the basis that the testimony is speculative: ¶¶ 31, 33, 34, 36, 45, 47, 52, 71, 84, 92. (Objection 2.)

The Court overrules Defendants' objections to the following paragraphs to the extent that this testimony is based on Clark's knowledge of California Peace Officer Standards and Training (POST): ¶¶ 82, 87, 88, 89, 90, 91, 92. (Objection ¶¶ 2–3.)

# V. REQUESTS FOR JUDICIAL NOTICE

In support of their Motion for Summary Judgment, Defendants request judicial notice of Defendants' Answer to First Amended Complaint and of the Supreme Court Decision in *Kisela v. Hughes*, 138 S.Ct. 1148 (2018). (ECF Nos. 21, 62.) Plaintiffs have not opposed these requests.

Documents that are part of the public record may be judicially noticed to show that a judicial proceeding occurred or that a document was filed in another court case, but a court may not take judicial notice of findings of facts from another case. *See Wyatt v. Terhune*, 315 F.3d 1108, 1114 & n.5 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). Nor may the court take judicial notice of any matter that is in dispute. *Lee*, 250 F.3d at 689–90. Because both of these documents are public records, the Court **GRANTS** Defendants' requests for judicial notice as to the existence of Defendants' Answer to First Amended Complaint (ECF No. 21) and the Supreme Court's decision in *Kisela*. *See* Fed. R. Evid. 201(b).

## VI. DISCUSSION

Defendants move for summary judgment on each of Plaintiffs' six claims. Defendants argue that Officer Fowler's and Officer Cordova's (collectively "Officers") use of lethal force was objectively reasonable as a matter of law because they were responding to an immediate threat. Plaintiffs counter that there is a material dispute of fact regarding the constitutionality of the Officers' use of force.

As detailed below, the Court finds that genuine issues of material fact exist concerning whether Officer Cordova's use of force was reasonable. Thus, the Court **DENIES** summary judgment as to Plaintiffs' § 1983 excessive force, assault and battery, and wrongful death claims against Officer Cordova. The Court also **DENIES** summary judgment as to Plaintiffs' California Civil Rights Violation claim against the City of Indio, the Indio Police Department, and Officer Cordova. The Court **GRANTS** summary judgment as to Plaintiffs' § 1983 excessive force, assault and battery, and wrongful death claims against Officer Fowler. Finally, the Court **GRANTS** summary judgment as to Plaintiffs' municipal liability, and Fourteenth Amendment claims against the City of Indio, the Indio Police Department, and Does 6 through 10.

///

///

**A.      Federal Section 1983 Claims**

Section 1983 creates a cause of action against any person who, acting under the color of state law, abridges rights established by the Constitution or laws of the United States. *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1056 (9th Cir. 2002). The statute "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 156 (1979). To state a claim under § 1983, a plaintiff must both (1) allege the deprivation of a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law. *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42 (1988)).

Plaintiffs, as successors in interest to Montanez and individually, allege violations of the Fourth Amendment against Officers Fowler and Cordova. Plaintiffs also allege liability on the part of the City of Indio, the Indio Police Department, and Does 6–10 under *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). (Compl.)

**1. Fourth Amendment Claim - Excessive Force/Unreasonable Seizure**

Defendants move for summary judgment on Plaintiffs' excessive force claim on the grounds that both Officers Fowler and Cordova used reasonable force against Montanez. Plaintiffs, on the other hand, allege that both Officers employed unconstitutional excessive/unreasonable force against Montanez and therefore engaged in an unreasonable seizure in violation of the Fourth Amendment.

Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 397 (1989). When evaluating a Fourth Amendment claim of excessive force, a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id*. This analysis requires balancing the "nature and quality of the intrusion" on a person's liberty with the "countervailing governmental interests at stake" to determine whether the use of force was objectively

reasonable under the circumstances. *Id.* at 396. Determining whether a police officer's use of force was reasonable or excessive "requires careful attention to the facts and circumstances of each particular case" and a "careful balancing" of an individual's liberty with the government's interest in the application of force. *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "Force is excessive when it is greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). Accordingly,

> "[a]lthough it is undoubtedly true that police officers are often forced to make split-second judgments, and that therefore not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers is a violation of the Fourth Amendment, it is equally true that even where some force is justified, the amount actually used may be excessive."

*Id.* at 853 (citations and internal quotations omitted.)

In determining whether an officer's actions were reasonable, courts balance the "nature and quality of the intrusion" on the individual's Fourth Amendment interests against the "countervailing governmental interests at stake." *Id.* at 396. The force applied by officers must be balanced against the need for that force. *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1058–60 (9th Cir. 2003). In *Graham*, the Supreme Court listed several factors to determine the reasonableness of the use of force under the Fourth Amendment including: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396.

The *Graham* factors, however, are not exhaustive. *George v. Morris,* 736 F.3d 829, 837–38 (9th Cir. 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir.

2011), courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citations omitted). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given, and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

"Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw therefrom," the Ninth Circuit has held on many occasions that summary judgment in excessive force cases should be granted sparingly. *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). "This is because police misconduct cases almost always turn on a jury's credibility determinations." *Id.*

### Excessive Force Claim Against Officer Fowler

#### a)    Nature and Quality of the Intrusion

Plaintiffs argue that Officer Fowler's decision to use his taser on Montanez was unreasonable given the totality of the circumstances. (Opposition to Defendants' Motion for Summary Judgment ("Opp'n") 17, ECF No. 48.) While Officer Fowler claims that Montanez remained on his feet after Fowler struck him with the taser, Plaintiffs argue that only one "probe/barb" struck Montanez, and that the taser did not incapacitate Montanez because it was ineffective. (*Compare* Fowler Decl. ¶¶ 16–17, *with* SGI ¶ 33)

The Ninth Circuit has held that while tasers fall within the category of non-lethal force, "all force—lethal and non-lethal—must be justified by the need for the specific level of force employed." *Bryan*, 630 F.3d at 825 (citations omitted). "Less than deadly force, like deadly force, may not be used without sufficient reason; rather, it is subject to the *Graham* balancing test." *Deorle*, 272 F.3d at 1284–85. The Court will now address each factor as they pertain to Officer Fowler's actions below.

### b) Government Issues at Stake

#### i. *The Severity of the Crime*

First, the Court first considers the severity of the crime at issue. It is undisputed that Officer Fowler was dispatched to respond to the 911 call complaining of a "Hispanic male in a grey shirt and jeans with a knife" who was threatening the reporting party. (SGI ¶ 6.) When Officer Fowler arrived at the scene and noticed Montanez, he observed a metallic object in his hand that he eventually recognized as a pair of scissors. (Fowler Decl. ¶¶ 7, 12.) Defendants argue that Montanez's actions "were very serious and immediately put Fowler in apprehension of immediate great bodily injury or death." (Mot. 10.) To support their contention, Defendants cite to several cases to illustrate that the courts have consistently recognized that scissors have been held as a deadly weapon. (Mot. 9); *e.g.*, *In re Conrad V.*, 176 Cal. App. 3d 775 (1986) (stating that items such as scissors and letter openers can be used as deadly weapons); *People v. Mitchell*, 4 Cal. App. 5th 349 (2016) (holding that use of scissors justified conviction for assault with a deadly weapon).

The California Penal Code states that a "deadly weapon" is any object, instrument or weapon used in such a matter capable and likely to produce death or great bodily injury. Cal. Penal Code § 245. However, the determination of whether an object not inherently deadly or dangerous is used as such is a question of fact to be determined by a jury or trier of fact. *People v. Aguilar*, 16 Cal.4th 1023, 1028–29 (1997). While the Court recognizes that a pair of scissors can certainly be used as a deadly weapon, there is significant dispute between the parties regarding the manner in which Montanez held the scissors, and whether in fact Montanez posed an "immediate threat" to the Officers. Defendants state that Montanez "began to run towards Officer Fowler with a pair of scissors," which prompted Fowler to draw out his taser. (SUF ¶¶ 20–21.) Plaintiffs, on the other hand, argue that Montanez "never raised the scissors in a threatening manner and held it below his waist during the entire sequence of events." (Opp'n 12.)

In the light most favorable to Plaintiffs, this evidence supports the conclusion that Montanez's conduct constituted, at most, a misdemeanor offense. *See* Cal. Penal Code § 417(a)(1). Under the California Penal Code, exhibiting a deadly weapon consists of drawing or exhibiting a deadly weapon in the presence of another in a rude, angry, or threatening manner. Cal. Penal Code § 417(a)(1). The Court finds that Montanez's conduct—quickly advancing upon Officer Fowler, yelling in Spanish aggressively, and taking a "bladed" stance as one preparing to fight, warranted the use of reasonable force. (*See* Fowler's BWC Footage.) Therefore, Fowler's use of his taser was reasonable under the circumstances. Therefore, this factor favors summary judgment.

### ii. Immediacy of Threat to Safety of Officers or Others

In the Ninth Circuit, "whether the suspect poses an immediate threat" is the most important single element of the three specific *Graham* factors. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). The original call to 911 stated Montanez was threatening the caller with a knife, and then the caller said he had scissors. (SGI ¶¶ 1, 5.) Officer Fowler states that Montanez began to run towards him with the scissors, yelling at him in Spanish. (Fowler Decl. ¶¶ 12–13.) Fowler's BWC Footage verifies that this is an accurate description. (Fowler's BWC Footage.) Fowler claims that he feared for his safety because he thought that Montanez would attack him with the scissors. (Fowler Decl. ¶ 15.) Defendants argue that Montanez was an immediate threat to Officer Fowler's safety because he was "a mentally ill individual armed with a sharp-edged weapon." (*See* Mot. 11.) Plaintiffs, on the other hand, dispute whether Officer Fowler in fact feared for his life during his encounter with Montanez. (Opp'n 11.) Plaintiffs emphasize that Montanez was 71 years-old, 5 feet, 3 inches tall, 113 pounds, and barefoot at the time of the incident. (*Id.* at 6, 13.) Plaintiffs contend that both Officers Fowler and Cordova were aware that Montanez was suffering from a mental illness and that he was acting consistent with the "crazy" mental illness they knew about prior to the incident. (*Id*. at 14.) Furthermore, because Officer Fowler

never drew his firearm, Plaintiffs conclude that Fowler "never, at any point during the encounter, perceived a reasonable threat of serious bodily injury or death to himself or to Defendant Cordova." (*Id.*)

Even while viewing these facts in Plaintiffs favor, as they must be on summary judgment, the Court finds that no genuine dispute exists regarding whether Montanez posed an "immediate threat" to Officer Fowler. Montanez was yelling aggressively, quickly advancing towards Officer Fowler, and holding a pair of scissors. Any reasonable person would find this behavior threatening. Accordingly, this factor weighs in favor of granting summary judgment.

### iii. *Resisting Arrest or Attempting Escape*

Turning to the third *Graham* prong, the Court finds that a jury would most likely find that Montanez was resisting arrest under the circumstances. Officer Fowler told Montanez to "stop" and to "drop [the scissors]" but Montanez did not comply. (Fowler Decl. ¶ 16; SGI ¶ 26.) The video footage clearly shows that Montanez was agitated and yelling at Officer Fowler. (Fowler's BWC Footage.) He refused to obey orders to get on the ground and positioned himself in a combative stance. (*Id.*) Therefore, this factor weighs in favor of summary judgment.

### iv. *Other Considerations*

In addition to the *Graham* factors, the Ninth Circuit has identified several other factors that may be appropriately considered to determine whether an officer's use of force in a particular case. These factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given, and whether it should have been apparent to officers that the person they used force against was emotionally disturbed. *Glenn*, 673 F.3d at 876.

Officer Fowler did not warn Montanez before deploying his taser, but he did command Montanez to "stop" and "drop it" when Montanez was advancing toward Fowler. (*See* SGI ¶¶ 25–28.) According to Defendants, Officer Fowler "did everything he could to ensure his safety and subdue Montanez," including attempting

to maintain a safe distance, and calling for backup. (Mot. 12.) Defendants argue that the use of his RCB would have put him at risk of being stabbed by Montanez, pepper spray is not guaranteed to stop an individual, and that he used his taser in order to maintain a safe distance and to avoid being stabbed or injured by the scissors. (*Id*.)

### c) Balancing Competing Interests

When evaluating a Fourth Amendment claim of excessive force, the inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them" based on the totality of the circumstances. *Glenn*, 673 F.3d at 871. Under all of the circumstances here, when the record is viewed in the light most favorable to the nonmoving party, the *Graham* factors weigh in favor of summary judgment as to Plaintiffs' excessive force claims against Officer Fowler. The Court finds that under these facts, a reasonable jury would not find any disputed material facts regarding Officer Fowler's use of his taser against Montanez. In turn, the Court agrees that "[w]ith no lesser viable alternative method to subdue or control Montanez," Defendants' use of the taser was a reasonable application of force. (*Id*.) Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiffs' claim of excessive force against Officer Fowler.

### Excessive Force Claim Against Cordova

### a) Nature and Quality of the Intrusion

There is no dispute that Officer Cordova used deadly force that resulted in Montanez's death. Thus, the "nature and quality of the intrusion" by Cordova on Montanez's Fourth Amendment interests was extreme. *A.K.H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). The Supreme Court has emphasized that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a "fundamental interest in his own life" and because such force "frustrates the interest of the individual, and of society, in judicial determination of guilt and

punishment." *Id*. Accordingly, "[a]n officer's use of deadly force is permissible only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (citing *Tennessee*, 471 U.S. at 3).

This quantum of force must be measured against the *Graham* factors below.

### b) Governmental Interests at Stake

As with claims for excessive non-deadly force, the governmental interests in excessive deadly force claims are considered using the *Graham* factors. *Graham*, 490 U.S. at 396–97; *Mattos*, 661 F.3d at 441. There are disputed genuine issues of fact material to the consideration of the first and second factors, but viewing the facts in a light most favorable to Plaintiffs, both factors weigh against Officer Cordova's use of force. The third factor weighs in favor of Cordova.

#### i. Severity of Crime

Here, there is no dispute that Officer Cordova responded to the scene based on Officer Fowler's radio messages to police dispatch, stating that Montanez was "coming at him with scissors." (SGI ¶ 24.) Additionally, Fowler radioed dispatch that he deployed his taser, but Montanez was not "going down;" after which Fowler radioed a "Code 11," an escalation and a request for a backup officer on a shortened response time. (Fowler Decl. ¶ 17; SGI ¶¶ 33–34.)

As stated in the above analysis regarding Officer Fowler, the parties dispute facts that are material to a determination of what crime Montanez could be reasonably perceived as committing when he was shot by Cordova. At the time Officer Cordova shot Montanez, Montanez was holding a pair of scissors in his right hand. (SGI ¶ 45.) Therefore, he could be reasonably perceived as committing the misdemeanor of brandishing or exhibiting a deadly weapon, which consists of drawing or exhibiting a deadly weapon in the presence of another in a rude, angry, or threatening manner. Cal. Penal Code § 417(a)(1). However, Defendants argue that Montanez continued to approach Officer Cordova while holding the scissors and "positioning his body in a

bladed stance." (Mot. 6.) Defendants claim that Cordova was "[f]earful of Montanez attacking him with a deadly weapon," which caused him to "fire[] seven shots from his gun striking Montanez." (Mot. 6.) Plaintiffs, on the other hand, argue that Montanez held the scissors "near the tip of the blade with only his index finger and thumb as a child who is holding the pencil to write," and that "[h]e never raised the scissors in a threatening manner and held it below his waist during the entire sequence of events." (Opp'n 12.) Viewing the facts in the light most favorable to Plaintiffs, Montanez could only be suspected of committing a misdemeanor. This weighs against the use of deadly force by Cordova.

### ii. Immediate Threat

The parties also dispute whether Montanez posed an immediate threat to Officer Cordova's safety. Defendants' argue that Montanez's continued aggression after being tased by Officer Fowler and his threatening conduct show a significant government interest in removing the threat he caused. (*See* Mot. 14–15.) Plaintiffs dispute whether Cordova actually feared for his life during his confrontation with Montanez. First, Plaintiffs contend that Officer Cordova's "alleged fear" is immediately dispelled by the fact that Cordova "moved within close proximity to Montanez" and "stood his ground" just prior to shooting him. (Opp'n 13.) Plaintiffs further argue that Montanez never moved the scissors above his waist or made any movement toward either of the officers. (*Id*.) Lastly, Plaintiffs argue that Montanez was "significantly smaller than the 6 feet, 5 inches, 285-pound Defendant Cordova." (*Id*.)

Viewing the facts in the light most favorable to Plaintiffs, and drawing all justifiable inferences in the favor of Montanez, the Court concludes that this "most important *Graham* factor" weighs against Cordova's use of deadly force. *Mattos*, 661 F.3d at 441 (internal quotation marks omitted).

///

///

### iii. Resisting Arrest or Attempting Escape

Turning to the third factor, it is undisputed that Montanez approached Officer Fowler with the scissors in his hand and that Fowler yelled commands to Montanez multiple times, telling him to "get on the ground." (SGI ¶¶ 19, 30, 32, 35; Fowler BWC.) Although Plaintiffs object several times regarding what both the Officers and Montanez understood,[3] it is clear from the BWC footage that Montanez was aggressive, agitated, and actively resisting the Officers. (*See* Fowler's BWC.) Therefore, this factor weighs in favor of Defendants.

### iv. Other Considerations

As discussed above, the Court also considers additional factors which the Ninth Circuit has identified as relevant to the use-of-force inquiry. *See Glenn*, 673 F.3d at 876.

As to the first factor, the Ninth Circuit has held that although police are "required to consider what other tactics if any were available," to effect the arrest, officers "need not avail themselves of the least intrusive means of responding to an exigent situation." *Id.* at 876. Plaintiffs argue that both Officers admit that they were aware that Montanez was suffering from a mental illness and that "you would want to attempt to de-escalate such an individual and calm him rather than should at him." (Opp'n 13.) Defendants, on the other hand, argue that Officer Cordova "exited his vehicle with his RCB, pepper spray, taser gun, and service gun as available options," but that "the use of deadly force by Officer Cordova was reasonable and the only way to ensure that he would safely return home unharmed." (Mot. 14, 16.) Specifically, Defendants assert that although Cordova attempted to maintain a safe distance between himself and Montanez, he "quickly ran out of room" because he was standing in front of a street with passing traffic. (*Id.* at 14.) Defendants further argue that that the use of pepper spray would not have been effective, and that Montanez's aggression with the scissors made it clear that the RCB would not be an effective

---

[3] *See* SGI ¶¶ 50, 53.

deterrent because it would give Montanez an opportunity to stab Cordova. (*Id*.) Defendants argue that "in the forty-three seconds between the time [Cordova] exited his vehicle and shot Montanez, [Cordova] commanded Montanez eight times to either 'get on the ground' or 'not come towards me.'" (*Id*. at 15.) However, Defendants claim that Montanez "continued to approach wielding a pair of scissors in a position to strike." (*Id*.)

Finally, the Court considers Montanez's mental state. *See Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). The Ninth Circuit has emphasized that "where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Id*. Further, "even 'when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted … with a mentally ill individual.'" *Bryan*, 630 F.3d at 829 (citing *Deorle*, 272 F.3d at 1283).

Here, Plaintiffs argue that Officer Cordova was aware that Montanez suffered from a mental illness and that Cordova made the judgment that Montanez was "crazy" based on observing him at JFK Hospital on August 12, 2016. (Opp'n 3–4, 14; Cordova Depo., 159:01–161:01.) Although Defendants admit that both Officers "had observed Montanez acting strangely," Defendants claim that "[t]heir knowledge of his actual mental condition is questionable." (Reply 6.) Defendants inaccurately cite *Doyle* to claim that "[t]here is no requirement that mentally ill individuals [are] to be treated differently than other suspects." (*Id*.) However, the *Doyle* court clearly stated that there is no "per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals," but if a suspect is emotionally disturbed, it is a factor "that must be considered." *Doyle*, 272 F.3d at 1283. Accordingly, this factor weighs against summary judgment.

///

### c) Balancing Competing Interests

In conclusion, the totality of the circumstances shows that there are genuine issues of material fact that prevent the Court from determining as a matter of law whether the force employed by Officer Cordova violated Montanez's Fourth Amendment rights. Therefore, the Court **DENIES** summary judgment as to Plaintiffs' claim of excessive force against Officer Cordova.

### 2. Fourteenth Amendment Claim – Substantive Due Process Violation: Interference with Familial Integrity

Plaintiffs also assert a Fourteenth Amendment substantive due process claim against Defendants for the alleged deprivation of their liberty interests in the companionship and society of the decedent. *See Lemire v. Cal. Dep't of Corrections & Rehabilitation*, 726 F.3d 1062, 1075 (9th Cir. 2013) (citations omitted). Government conduct may offend due process only when it "'shocks the conscience' and violates the 'decencies of civilized conduct.'" *Cty. Of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). An officer's conduct shocks the conscience if he or she acted with either (1) deliberate indifference, or (2) a purpose to harm the decedent for reasons unrelated to legitimate law enforcement objectives. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). The appropriate standard of culpability in a given case turns on whether the officer had an opportunity for actual deliberation. *Id.* at 1138. In a situation where a law enforcement officer's deliberation is practical, the "deliberate indifference" standard may suffice to shock the conscience; "[o]n the other hand, when an officer makes a "snap judgment" because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

Here, the Court finds that the evidence establishes that Defendant Officers Fowler and Cordova faced a quickly-evolving situation in deciding to use their

weapons. Therefore, the purpose to harm standard must apply to Plaintiffs' Fourteenth Amendment claim. Plaintiffs offer an ineffective conclusory argument that the evidence alone establishes that the Officers' conduct shocks the conscience, merely restating the facts regarding the Officers' knowledge of Montanez's mental illness, his physical build, and the way he was holding the scissors. (Opp'n 21.) However, without specific evidence showing an actual intent to harm Montanez unrelated to legitimate law enforcement objectives, Plaintiffs' Fourteenth Amendment claim fails. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment with respect to Plaintiffs' Fourteenth Amendment claim.

### 3. Qualified Immunity

Section 1983 provides that "[e]very person who, under the color of any [state law] subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]" 42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

However, "[a]n official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). While "[q]ualified immunity shields federal and state officials from money damages," *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011), it is "an immunity from suit rather than a mere defense to liability [and] is effectively lost if a case is erroneously permitted to go to trial[,]" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

A district court evaluating whether a government official is entitled to qualified immunity at the summary judgment stage asks two questions: (1) whether, taking the facts in the light most favorable to the nonmoving party, the officers' conduct violated

a federal statutory or constitutional right, and (2) whether the right was clearly established at the time of the alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). Either prong of the qualified immunity analysis may be tackled first. *Ashcroft*, 563 U.S. at 735 (citing *Pearson*, 555 U.S. at 236.) If the answer to either prong is no, then the officers cannot be held liable for damages. *See Pearson*, 555 U.S. at 231.

With respect to the second prong, "[b]ecause the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). For this reason, the Supreme Court has emphasized that "the salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). As the moving party, Defendants bear the initial burden on summary judgment of pointing out "an absence of evidence to support [Plaintiffs'] case." *Celotex*, 477 U.S. at 325. It is also Defendants' burden to prove that they are entitled to qualified immunity. *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

### a) Constitutional Violation

"The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003). If, as alleged, the conduct would not be considered in violation of the Constitution, the inquiry stops and the defense of qualified immunity applies. *Id*. However, if the answer to the first inquiry is yes, then the Court must determine whether the constitutional right was so clearly established that a reasonable officer would have understood that his conduct violated that right. *See Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier*, 533 U.S. at 201–02) (finding that the "relevant, dispositive inquiry in determining whether a right is established is whether it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted."). Even if an officer's conduct does violate the Constitution, "a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity." *Wilkins*, 350 F.3d at 955.

This first prong "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). First, the Court has determined that Officer Fowler's use of his taser, as alleged, was not unreasonable. Hence, Officer Fowler is entitled to qualified immunity. However, the Court does find that the record evidence presents genuine issues of material fact as to whether Officer Cordova's use of deadly force was excessive under the circumstances. Therefore, Plaintiffs satisfy the first prong of *Saucier* as it pertains to Officer Cordova only.

**b)      Clearly Established**

"[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. This inquiry "must be undertaken in light of the specific context of the case, not as a broad, general proposition." *Id.* at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Because qualified immunity is an affirmative defense, the burden of proving the absence of a clearly established right initially lies with the official asserting the defense. *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982).

Turning to the force used by Officer Cordova, viewing the evidence in the light most favorable to Plaintiffs, the state law as of August 20, 2016, when the shooting occurred, gave Officer Cordova fair warning that his use of deadly force was unconstitutional. Therefore, Defendants' argument that Officer Cordova is entitled to qualified immunity on this claim at the summary judgment phase fails.

As described above, a jury could reasonably conclude that (1) both Officers knew or had reason to know that Montanez was mentally ill, (2) Montanez at most committed the misdemeanor of exhibiting a potentially deadly weapon, and (3) Cordova could have used less intrusive force given that Cordova and Fowler outnumbered Montanez, and Montanez was elderly and significantly smaller than Cordova. In *Estate of Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017), the Ninth Circuit determined that the case law as of 2013 clearly established that an officer's use of deadly force against an armed individual who was not pointing a weapon at the officer violated the Fourth Amendment.

The *Gelhaus* court cites *George v. Morris*, 736 F.3d 829 (9th Cir. 2013), where police officers responded to the 911 call of the decedent's wife, who could be heard exclaiming that her husband had a gun. *Id*. at 832. The husband, sixty-four years old, with terminal brain cancer, was using a walker when he moved onto his balcony in view of the officers. *Id*. He was holding a gun in his left hand with the barrel pointing down. *Id*. The officers identified themselves and instructed him to show his hands. *Id*. At this point, an officer testified that the husband "turn[ed] straight east and raise[d] [the gun]" and "point[ed] it directly at [him]," prompting him to fire. *Id*. at 833 n.4. However, there was reliable evidence to support the plaintiff's version of the event, so the court assumed the husband did not take any other actions that would have been objectively threatening and held that "a reasonable fact-finder could conclude the deputies' use of force was constitutionally excessive." *Id*. at 838.

Here, viewing the facts in the light most favorable to Plaintiffs, Officer Cordova used lethal force against Montanez, who was mentally ill, barefoot, seventy-one years old, of slight build, and holding a pair of scissors that were not pointed directly toward Cordova. The Court finds that Defendants have not met the burden of proving the absence of a clearly established right under these circumstances. Therefore, considering the law at the time set forth in *George* and *Gelhaus*, the Court cannot find that Officer Cordova is entitled to qualified immunity.

### 4. Municipal Liability

A law enforcement agency may be liable under § 1983 for failing to train its officers, but only where that failure to train amounts to a "deliberate indifference" to a plaintiff's civil rights. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To prove deliberate indifference, a plaintiff "must demonstrate a 'conscious" or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim." *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008)). Similarly, in *Monell*, the Supreme Court held that a showing of an unconstitutional "custom, practice, or policy" may open a municipality to § 1983 liability. *Id.* at 694. To succeed on a *Monell* claim, a plaintiff must establish that (1) the law enforcement officers acted under color of law; (2) the officers' actions deprived the plaintiff if his/her rights as afforded by the Constitution; and (3) the officers acted pursuant to an official policy or longstanding practice or custom. *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

The Court finds as a matter of law that the City of Indio and the Indio Police Department did not act with deliberate indifference to Plaintiffs' civil rights, and that the City of Indio does not enforce an unconstitutional custom, practice, or policy. Defendants have established that, currently and at the time of the incident, the City of Indio and the Indio Police Department, have an express policy requiring that its officers not willfully violate state or federal law. (*See* Martinelli Decl., Ex. B.—Indio Police Department Policies, ECF No. 46-5.) Plaintiffs have not offered any genuine facts to refute Defendants' policies, and there is no suggestion that the policies or training practices themselves instruct the officers to engage in unlawful conduct. Where the opposing party fails to challenge the facts asserted by the moving party in the manner required by Federal Rule of Civil Procedure 56(c), the Court may consider the facts undisputed for purposes of the motion and grant summary judgment where the movants are so entitled. FRCP 56(e)(2)–(3); Local Rule 56-3; *Beard v. Banks*, 548 U.S. 521, 527 (2006) (failure to specifically challenge facts identified in moving

party's statement will be deemed admission of those facts). Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to the claims against the City of Indio and the Indio Police Department..

**B.    State Law Claims: Assault and Battery, and Wrongful Death**

Plaintiffs' state law claims for assault and battery, and wrongful death rest on the same facts as the asserted excessive force claims. *See Evans v. City of San Diego*, 913 F. Supp. 2d 986, 999 (S.D. Cal. 2012) (citing *Atkinson v. Cnty. of Tulare*, 790 F. Supp. 2d 1188, 1211 (E.D. Cal. 2011)). To prove these causes of action at trial, Plaintiffs must demonstrate that Defendants acted unreasonably under the circumstances. The Court has concluded that a material issue of fact exists as to whether Officer Cordova's use of deadly force against Montanez was reasonable, and denied Defendants' motion for summary judgment on the excessive force claim against Officer Cordova on that basis. Accordingly, Defendants' motion for summary judgment as to the state law claims for assault and battery, and wrongful death against Officer Cordova is **DENIED**. Conversely, the Court **GRANTS** Defendants' motion for summary judgment as to the state law claims against Officer Fowler

**C.    Cal. Civ. Code § 52.1 Civil Rights Violation**

Finally, Plaintiffs argue that Defendant Officer Cordova violated California Civil Code section 52.1 (The Bane Act). The Tom Bane Civil Rights Act, 1987 Cal. Stat. 4544, enacted in 1987 to address hate crimes, civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law where the interference is carried out "by threats, intimidation or coercion." *Reese v. Cty. of Sacramento*, No. 16-16195, 2018 WL 1902416, at *6 (9th Cir. 2018) (citing *Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230, 1242 (2007)). Claims under section 52.1 may be brought against public officials who are alleged to interfere with protected rights, and qualified immunity is not available for those claims. *See Venegas*, 153 Cal. App. 4th at 1245. Plaintiffs allege a Bane Act violation based upon

the same facts as their Fourth Amendment excessive force claims against both Officers.  (Compl. 16.)

The Ninth Circuit has held that "the elements of [an] excessive force claim under § 52.1 are the same as under § 1983." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014).  However, while the Bane Act does not require the "threat, intimidation or coercion" element of the claim to be "transactionally independent from the constitutional violation alleged … the Bane Act requires 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" *Reece*, 2018 WL 1902416, at *8 (citing *Cornell v. City and Cty. Of San Francisco*, 17 Cal. App. 5th 766 (2017)).  When applying the specific intent standard to an excessive force violation, "a mere intention to use force that the jury ultimately finds unreasonable—that is, general criminal intent is insufficient." *Reece*, 2018 WL 1902416, at *6 (citing *United States v. Reece*, 2 F.3d 870, 885 (9th Cir. 1993)).  "Rather the jury must find that the defendants 'intended not only to use the force, but its unreasonableness, its character as 'more than necessary under the circumstances.'" *Id*.

Plaintiffs argue that "[w]hile [they] do not admit that there was any additional threat, intimidation or coercion necessary than that inherent in the excessive force allegations and violations of [] Montanez's rights," that triable issues of fact exist as to material issues underlying these claims based on Officer Cordova stating "I'm going to shoot you" during his "encounter" with Montanez.  (Opp'n 25.)  The Court agrees.  Viewing the record in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could find that Officer Cordova had a specific intent to violate Montanez's rights.   Accordingly, the Court **DENIES** Defendants' motion for summary judgment as to Plaintiffs' state civil rights claim under § 52.1.

///

///

///

## VII. CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 46) is **GRANTED IN PART** and **DENIED IN PART.** It is **GRANTED** with respect to: (1) the first claim of excessive force claim as it pertains to Officer Fowler; (2) the second claim of Municipal Liability against the City of Indio and the Indio Police Department; (3) the third claim of Substantive Due Process Violation against all Defendants; and (4) the fourth claim of Assault and Battery as it pertains to Officer Fowler in his individual capacity. Otherwise, the Defendants' motion is **DENIED**.

**IT IS SO ORDERED.**

April 25, 2018

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**